IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 07-cr-238 |
| RODERICK WATSON | : | |

## OPINION

Slomsky, J.                                                                                          May 6, 2010

## I.    INTRODUCTION

On October 30, 2007, Defendant Roderick Watson was charged in a Superseding Indictment with one count of conspiracy to interfere with interstate commerce by robbery in violation of 18 U.S.C. § 1951(a) (Count One); four counts of interference with interstate commerce by robbery, and aiding and abetting, in violation of 18 U.S.C. §§ 1951(a) and 2 (Counts Two, Three, Four, and Six); two counts of using and carrying a firearm during a crime of violence, and aiding and abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 (Counts Five and Seven); and one count of interstate transportation of stolen goods, and aiding and abetting, in violation of 18 U.S.C. §§ 2314 and 2 (Count Eight).

On January 23, 2009, the Honorable Bruce W. Kauffman, a retired Judge of this Court, issued a Memorandum and Order denying Defendant's Motion to Suppress Physical Evidence (Three Men's Rolex Watches) (Doc. No. 62). In a footnote to the Memorandum, Judge Kauffman explained:

> After the December 17, 2008 suppression hearing, Defendant filed a second Motion to Suppress in which he argues that the contents of a black duffel bag were seized in violation of the Fourth Amendment. The Motion to Suppress the duffel bag and its contents, as well as Defendant's pending Motion to Sever, will be addressed in a subsequent Memorandum and Order.

Doc. No. 62, at 8 n.6.

Currently before the Court is Defendant's Motion to Suppress Physical Evidence (Black Duffel Bag recovered on August 30, 2007) (Doc. No. 60). On December 24, 2008, Defendant filed the Motion at issue as an addendum to the Motion to Suppress Physical Evidence (Three Men's Rolex Watches) (Doc. No. 50). On January 20, 2009, the Government filed a Response in Opposition to Defendant's Addendum (Doc. No. 61). On April 5, 2010, the Government filed a sealed supplemental Opposition Brief (Doc. No. 88).

Also before the Court is a Motion to Sever (Doc. No. 55) filed by Defendant on June 6, 2008. On November 20, 2008, the Government filed an Omnibus Response in Opposition to Defendant's Pre-Trial Motions, which included a Response to the Motion to Sever (Doc. No. 58). On April 14, 2010, the Court held a hearing on the Motion to Suppress Physical Evidence (Black Duffel Bag) and the Motion to Sever. For the reasons that follow, the Court will deny both Motions.

## II.    STATEMENT OF FACTS

On August 30, 2007, Defendant was inside a residence at 120 North Felton Street in Philadelphia, Pennsylvania when several agents of the Federal Bureau of Investigation and officers of the Philadelphia Police Department arrived at the residence with an arrest warrant for Defendant.[1] Special Agent Stephen J. Heaney, a nineteen-year veteran of the FBI and seven-year veteran of the bank robbery/violent crimes squad, was a leader of the investigation of Defendant Watson that led to his arrest. (Hearing Transcript, April 14, 2010 ("Tr.") at 30:20-31:5). The investigation included

---

[1] At the April 14, 2010 hearing, the Government presented testimony from Special Agent Stephen Heaney and Defendant presented testimony from Tiffany McGeth, a resident of the home where Defendant was arrested. The factual findings are based on the testimony of these witnesses, Judge Kauffman's Memorandum dated January 23, 2009, and this Court's credibility determinations.

surveillance of different locations based on Defendant's phone records.  (Id. at 53:20-24.)

On the afternoon of August 30, 2007, Agents knocked and announced their presence at 120 North Felton Street, after which Defendant stated that he would open the door and come onto the porch.  (Id. at 39:24-40:2.)  Upon being arrested, Defendant asked to go back into the house.  Once inside, he was searched and jewelry was removed from his person.  (Id. at 40:6-11.)  Subsequently, Defendant was removed from the residence and transported to the local FBI office.  (Id. at 40:11-12.)

After the arrest, several FBI Agents remained inside the house.  Agent Heaney stayed to interview Tiffany McGeth, a female resident of the home who was coming downstairs as Defendant was being escorted out of the house.  (Id. at 40:15-16; 62:14-25.)  Agent Heaney and Ms. McGeth sat at the dining room or kitchen table where they had a conversation about Defendant's arrest.  (Id. at 40:16-25.)  Agent Heaney explained that the FBI wanted to search the residence, and he presented her with a consent to search form.  (Id. at 41:12-15.)  Agent Heaney read the consent form to Ms. McGeth, and Agent Heaney explained to her that she had the right to refuse to sign the form.  (Id. at 42:25-43:14.)  Ms. McGeth signed the consent form, as did Agent Heaney and Special Agents Kevin McShane and William Shute.  (Id. at 42:4-9.)  Additionally, Ms. McGeth orally granted permission to the Agents to search the home.  (Id. at 42-22-43:14.)  After Ms. McGeth signed the consent form, a black duffel bag was found behind the table in the dining room area and was seized. (Id. at 44:16-22; 72:1-13.)  Ms. McGeth admitted that she did not own the black duffel bag, nor had she ever seen the bag before.  (Id. at 119:2-19.)

### III.    MOTION TO SUPPRESS

A.    Motion to Suppress Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Whether a search is reasonable will depend upon its nature and all of the circumstances surrounding it. United States v. Whitted, 541 F.3d 480, 484 (3d Cir. 2008). As a general rule, on a Motion to Suppress evidence obtained during a search and seizure, the movant bears the burden of proof. United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." Id.; see also United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). Generally, warrantless searches are presumed to be unreasonable and suppression of all evidence obtained from an unreasonable search is the appropriate remedy. United States v. Myers, 308 F.3d 251, 278-79 (3d Cir. 2002) (citing Mapp v. Ohio, 367 U.S. 643, 654-55 (1961) (describing the exclusionary rule of criminal procedure)).

Here, the Government concedes that the Agents seized the evidence at issue during a warrantless search. The Government contends, however, that the seizure of the black duffel bag from Ms. McGeth's home falls squarely within an exception to the warrant requirement. Specifically, the Government argues that Ms. McGeth consented to a search of the premises, thus negating the requirement to obtain a search warrant. In contrast, Defendant Watson claims that Ms. McGeth did not offer valid consent to the Agents to search her home, and that the black duffel bag is the product of a warrantless search and seizure that is unreasonable under the Fourth Amendment.

B.    Defendant Has Legal Standing to Challenge the Search

As a preliminary issue, the Government argues that Defendant Watson lacks legal standing to contest the reasonableness of the search of Ms. McGeth's residence.[2]  As the oft-quoted adage notes, the "Fourth Amendment protects people, not places."  United States v. Katz, 389 U.S. 347, 351-52 (1967).  In other words, "[t]o invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by a challenged search or seizure."  United States v. Stearn, 597 F.3d 540, 551 (3d Cir. 2010) (citing Rakas v. Illinois, 439 U.S. 128, 132-34 (1978)).  A defendant's Fourth Amendment rights are not violated by the introduction of evidence obtained in violation of a third party's rights.  Rather, Fourth Amendment rights are "personal," and the defendant "bears the burden of proving not only that the search... was illegal, but also that he had a legitimate expectation of privacy in [the place searched]."  Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); see also United States v. King, 2010 WL 438417, *5 (3d Cir. Feb. 8, 2010) ("To establish standing, the party contesting the legality of the search bears the threshold burden of establishing that he or she had a reasonable expectation of privacy in the property searched and the item seized.").

In certain circumstances, a person may have a legitimate expectation of privacy in the home of someone else.  United States v. Perez, 280 F.3d 318, 337 (3d Cir. 2002).  For example, the Supreme Court has held that a co-resident of a shared dwelling or overnight guest in a home may claim the protection of the Fourth Amendment.  See Minnesota v. Carter, 525 U.S. 83, 90 (1998); Minnesota v. Olson, 495 U.S. 91, 110 (1990).

_____

[2]The Government raised the standing issue for the first time in its April 5, 2010 supplemental Opposition brief (Doc. No. 88).  Consequently, Judge Kauffman made no findings as to the standing issue in the Memorandum dated January 23, 2009 (Doc. No. 62).

At issue here is whether Defendant Watson has standing to challenge the search of Ms. McGeth's residence by virtue of being a co-resident or an overnight guest. The Government argues that Defendant did not have a legitimate expectation of privacy in Ms. McGeth's residence because he was merely an occasional visitor. (Govt. Supplemental Brief, at 5). The Government contends that though Defendant Watson was involved in a romantic relationship with Ms. McGeth, he is married to and resides with another woman, and that Ms. McGeth lived in her residence solely with her mother and daughter. The Government also maintains that at the grand jury hearing dated October 17, 2007, Ms. McGeth explained that she had not seen Defendant for approximately one month before he appeared at her home on August 30, 2007. (McGeth Grand Jury Testimony Transcript, 24:13-16). Finally, the Government submits that Judge Kauffman found in the Memorandum dated January 23, 2009 that Defendant stayed at Ms. McGeth's residence "occasionally." (Doc. No. 62, at 2). Accordingly, the Government urges that Defendant lacks standing to raise a Fourth Amendment challenge to the search of Ms. McGeth's residence.

The Court is not persuaded by the Government's argument. At the hearing held on April 14, 2010, Ms. McGeth testified to the intimate nature of her relationship with Defendant Watson, including the frequency of his visits and the typical duration of his stay with her.[3] Ms. McGeth explained that Defendant had a key to the residence at 120 North Felton Street, and that he paid all of the bills. (Tr. at 78:24-79:5; 89:9-13.) Ms. McGeth testified that after Defendant was arrested, she and Defendant spoke on the telephone on a daily basis. (Id. at 113:12-24.) Ms. McGeth revealed

---

[3]Notably, Ms. McGeth did not appear or testify at the Suppression Hearing held on December 18, 2008 before Judge Kauffman. Consequently, Judge Kauffman did not make any credibility determinations or findings of fact based on her testimony in the Memorandum dated January 23, 2009 (Doc. No. 62).

that on August 30, 2007, Defendant called her to say that he was coming over to her home, and that

she expected Defendant to stay overnight. (<u>Id.</u> at 79:10-22; 83:14-16.) Defendant arrived and let

himself into the home by using his own key. (<u>Id.</u> at 79:23-25.) Ms. McGeth testified that when

Defendant arrived at her home that day, she was upstairs in the bedroom with the door closed. She

heard "some scrambling downstairs" but was not overly alarmed because she was expecting

Defendant to arrive and let himself in. (<u>Id.</u> at 80:1-19.)

Based on this evidence, Defendant Watson has adequately established that on August 30,

2007, he had a reasonable expectation of privacy in Ms. McGeth's residence as an overnight guest.

Accordingly, Defendant has legal standing to challenge the search of Ms. McGeth's residence and

seizure of the black duffel bag.

C.       <u>Black Duffel Bag and Its Contents</u>

Defendant Watson argues that the black duffel bag found in Ms. McGeth's home is

inadmissible evidence because it was the fruit of a warrantless search.[4] The Government responds

---

[4]In the Addendum to the Motion to Suppress (Doc. No. 60), Defendant's argument is that
the search was invalid because it went beyond the scope of Ms. McGeth's consent. (Addendum,
¶19.) Defendant concedes in the Addendum that: "The Agents interviewed McGeth. The Agents
received verbal authority from McGeth to search the residence for the keys to the defendant's
vehicle. Agent Heaney requested that Tiffany McGeth sign a "Consent to Search" form. She
signed the form and the Agents searched the property." (<u>Id.</u>, ¶ ¶12-13.)

However, at the hearing on April 14, 2010, Defendant raised a different argument for the
first time through the testimony of Ms. McGeth. On direct examination, Ms. McGeth explained
that: (1) she never gave Agent Heaney consent to search the house (Tr. 84:16-17); (2) she only
received the Consent to Search form after the Agents searched the house and as they were
leaving (<u>Id.</u> at 87:3-18); and (3) she never went over the Consent to Search form with Agent
Heaney (<u>Id.</u> at 92:12-21).

The Court attributes this change in argument to Defense Counsel's contention that Ms.
McGeth could not be found when the Motion was originally filed. (<u>Id.</u> at 19:6-10.)
Consequently, the Court will address both Defendant's argument that Ms. McGeth never gave
consent to search to Agent Heaney and Defendant's argument that the search went beyond the
scope of Ms. McGeth's consent.

that the search was valid because Ms. McGeth, a resident of the house where Defendant was arrested, consented to the search by the Agents. The Court agrees and finds that the black duffel bag, and the sledgehammer, crow bar, screwdriver, gloves and any other contents therein, are admissible as the product of a valid search under the voluntary consent doctrine, and the search did not exceed the scope of consent.[5]

Generally, if voluntary consent is obtained from the person whose property is being searched or from a third party with common authority or joint control over the premises, the government may search the premises without a warrant. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (finding that despite the general warrant requirement for searches of private residences, "[i]t is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent"). The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Florida v. Jimeno, 500 U.S. 248, 250-51 (1991). "To justify a search based on consent, the Government 'has the burden of proving that the consent was, in fact, freely and voluntarily given.'" United States v. Price, 558 F.3d 270, 277-78 (3d Cir. 2009) (quoting Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

There is "no talismanic definition of 'voluntariness,' mechanically applicable to the host of situations where the question has arisen." Schneckloth, 412 U.S. at 224. Rather, voluntariness is a question of fact to be determined by examining the totality of the circumstances. Id. at 227.

---

[5]In the Memorandum dated January 23, 2009, Judge Kauffman found no merit to Defendant's argument that Ms. McGeth lacked actual authority to give consent, and the Court adopts Judge Kauffman's finding on this point. Whether Ms. McGeth actually gave consent, n.4 supra, was never raised before Judge Kauffman, and, consequently, Judge Kauffman made no factual findings on that issue.

Factors to consider include "the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions," United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003), and the age, education, and intelligence of the subject. United States v. Kim, 27 F.3d 947, 955 (3d Cir. 2003).

Here, Agent Heaney testified that after Defendant Watson was arrested and escorted out of the residence at 120 North Felton Street, he and Ms. McGeth had a conversation while sitting at the kitchen or dining room table. (Tr. at 40:16-25.) He explained to Ms. McGeth that he had an arrest warrant for Defendant, and he showed her a "wanted" flyer for Defendant's arrest. (Id. at 40:15-25.) After three men's Rolex watches were found in Ms. McGeth's upstairs bathroom, which was addressed at length in Judge Kauffman's January 23, 2009 Memorandum, Agent Heaney presented Ms. McGeth with a "consent to search" form. (Id. at 41:14-15.) The consent to search form stated in relevant part:

> 1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
>    120 N. Felton Street [handwritten]
>    Philadelphia, PA 19139 [handwritten]
> 2. I have been advised of my right to refuse consent.
> 3. I give this permission voluntarily.
> 4. I authorize these agents to take any items which they determine may be related to their investigation.

Govt. Exhibit 1.

The form states "Department of Justice: Federal Bureau of Investigation" at the top. Underneath that heading are the words "Consent to Search," printed in bold, capital letters. Though Ms. McGeth wears glasses (Id. at 121:18-25), she stated at the hearing that she could see the words on the form without glasses. (Id.) Agent Heaney read the consent form aloud to Ms. McGeth and told her that she had the right to refuse to sign the form. (Id. at 41:14-15.)

The consent to search form, dated August 30, 2007, was signed by Tiffany McGeth and Agents Heaney, McShane and Shute.  (Id. at 42:4-15.)  Agent Heaney testified that Ms. McGeth permitted a complete search of the residence by signing this form and by orally granting permission to do so.  (Id. at 42:17-25.)  Agent Heaney explained that his impression was that Ms. McGeth understood the form that she was signing, why the Agents were inside of her home that day, and that she had the right to refuse to sign the form.  (Id. at 42:22-43:3.)  Ms. McGeth did not appear to be intoxicated, and the Agents did not attempt to threaten or coerce her into signing the form.  (Id. at 42:5-15; 123:8-10.)  After Ms. McGeth signed the consent form, Agents began a search of the residence. During the search, Agents found and seized the black duffel bag and its contents which included, *inter alia*, a crowbar and sledgehammer.  Ms. McGeth testified that the bag did not belong to her, and that she had never seen the black duffel bag before.  (Id. at 119:2-19.)

Under the totality of the circumstances, the Court finds that Ms. McGeth voluntarily consented to a search of her residence on August 30, 2007.  Notwithstanding her testimony that Agents only asked her to sign the consent form after they had already completed the search (Id. at 87:3-16), that she did not know what she was signing (Id. at 92:17-21), and that the consent form does not feature a timestamp, the Court credits the testimony of Agent Heaney that Ms. McGeth granted consent without any reluctance, hesitation or limits whatsoever.  There was no prolonged questioning, and Agents did not ask any incriminating questions before seeking consent to search. Agent Heaney alone discussed the consent form with Ms. McGeth while the other Agents waited for permission to search.  Ms. McGeth's education level (12th Grade) and fluency in English are at least average, and there is no testimony that she was unable to read the consent form.  (Id. at 102:4-13; 121:15-122:17.)

In sum, the evidence shows that there was voluntary consent. Under these circumstances, Ms. McGeth's consent was voluntary, the search of her home was valid, and the seizure of the black duffel bag and its contents was not unreasonable. Consequently, Defendant Watson's Fourth Amendment rights were not violated, and the Motion to Suppress Physical Evidence (Black Duffel Bag) will be denied.

## IV.    MOTION TO SEVER

On June 10, 2008, Defendant filed a Motion in Limine to sever Count Eight of the Superseding Indictment, which charges Defendant with interstate transportation of stolen goods under 18 U.S.C. § 2314 (Doc. No. 55). Defendant Watson claims that joinder of Count Eight with Counts One through Seven in the Superseding Indictment was improper under Fed. R. Crim. P. 8(a) and 14(a).

Fed. R. Crim. P. 8(a) provides as follows:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged - whether felonies or misdemeanors or both - are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed. R. Crim. P. 14(a) allows a defendant to seek pretrial severance of counts and provides as follows:

> (a) Relief. If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Defendant argues that joinder under Rule 8(a) was improper because the offenses alleged in Count Eight are not "of the same or similar character" or "constitute parts of a common scheme or

plan" as those alleged in Counts One through Seven. Defendant claims that the allegations in Count Eight are that Defendant alone was involved in transporting stolen goods (three men's Rolex watches) from Chesapeake, Virginia to Philadelphia, Pennsylvania on or about August 30, 2007. In contrast, the allegations in Counts One through Seven involve alleged robberies that occurred between August 2003 and December 2004. The Government alleges in Counts One through Seven that Defendant did not act alone but rather acted as the ringleader of a conspiracy involving at least three other individuals. Finally, Counts One through Seven involve transporting goods from New Jersey to Pennsylvania, rather than from Virginia to Pennsylvania as alleged in Count Eight.

Defendant further contends that even if joinder is proper under Rule 8(a), Rule 14(a) allows the Court to exercise its discretion to sever counts if joinder will result in substantial prejudice to Defendant at trial. Defendant maintains that the allegations in Count Eight are separate and distinct from the allegations in Counts One through Seven because the robbery alleged in Count Eight was not part of a conspiracy and took place in a "wholly separate region of the country." (Def. Mot. to Sever, § 5.) Consequently, Defendant argues that bifurcation is warranted because he would suffer prejudice as follows: (1) the jury may cumulate evidence of crimes described in Counts One through Seven with the crimes described in Count Eight even though Count Eight consists of a robbery of different characteristics; and (2) the jury may improperly infer a criminal disposition with regard to Count Eight based on the allegations in Counts One through Seven.

The Government responds that joinder under Rule 8(a) is proper because all of the alleged robberies were of a similar character (i.e., jewelry store "smash and grab" robberies) and were part of a common plan or scheme "in which Watson engaged as the organizer of the robbery ring." (Govt. Omnibus Response, 10.) Additionally, the Government argues that even if the Court

bifurcates the proceedings and holds a trial on Counts One through Seven only, the same evidence would be admissible in a separate trial on Count Eight. Specifically, the Government contends that evidence of Defendant's involvement in other jewelry store robberies, including his possession of the crowbar and sledgehammer noted above, will be admissible to raise the inference that Defendant was responsible for taking and/or hiding the men's watches in Ms. McGeth's home. Further, evidence of the robberies alleged in Counts One through Seven would be admissible in a trial on Count Eight to prove Defendant's knowledge, identity, opportunity, and distinctive modus operandi. Consequently, the Government argues that severance under Rule 14(a) would serve no purpose as a jury will likely hear of Defendant's alleged criminal history regardless of whether the proceedings are bifurcated.

A. Joinder under Rule 8(a)

"The purpose of Rule 8 is to 'promote economy of judicial and prosecutorial resources.'" United States v. Shaw, 2009 WL 3790310, *6 (E.D. Pa. Nov. 9, 2009) (quoting United States v. Gorecki, 813 F.2d 40, 42 (3d Cir. 1987)). Rule 8(a) is a "liberal joinder provision," United States v. Niederberger, 580 F.2d 63, 66 (3d Cir. 1978), and judicial economy favors joinder. United States v. Sandini, 888 F.2d 300, 305 (3d Cir. 1989). Accordingly, Rule 8 is construed in favor of initial joinder, and courts construe the meaning of "same or similar character" very broadly. United States v. Hudgins, 338 Fed. App'x 150, 152 (3d Cir. 2009). Courts do not require all of the offenses in an indictment to be identical so long as a logical relationship exists between charges. United States v. Brooks, 2009 WL 116967, *2 (E.D. Pa. Jan. 15, 2009) (stating that Rule 8(a) "sets a high wall for [defendant] to try to scale in order to achieve the requested severance").

The issue here is whether the charge arising out of a robbery of three men's Rolex watches on or about August 30, 2007 (Count Eight) and charges of earlier store robberies (Counts One through Seven) are of the "same or similar character" or are "connected with or constitute parts of a common scheme or plan." Defendant Watson argues that Count Eight was improperly joined with Counts One through Seven due to variances in time, location, and actors.

The Court is not persuaded by Defendant's argument. Although Count Eight arises out of acts that occurred nearly three years after the crimes alleged in Counts One through Seven, and Count Eight charges the unlawful transportation of stolen goods from Virginia to Pennsylvania, rather than from New Jersey to Pennsylvania as featured in other counts, the facts show a logical relationship between the charges, and that the offenses charged are of a similar character and constitute parts of a common scheme or plan. See Brooks, 2009 WL 116967, at *2 ("Although the two [confrontations with police] were separated by seven months and more than a few miles in two different Philadelphia suburbs, they sufficiently share enough connection to invoke the presumption of judicial economy and service to the public interest addressed by joinder of offenses for a single trial.").

The five robberies from which the charges arise are similar in character and constitute a common scheme or plan. Each robbery allegedly involved an orchestrated plan by Defendant to forcefully rob a commercial store. Each robbery allegedly involved tools or weapons provided by Defendant. Each robbery allegedly involved Defendant acting in the capacity of driver and directing the transportation of stolen goods. Each robbery of a jewelry store allegedly involved a plan for Defendant to sell the stolen jewelry to a Philadelphia jeweler.

According to the Government, the first robbery (Count Two) took place on or about June 4, 2002 at Whitehall Company Jewelers inside the Moorestown Mall in Moorestown, New Jersey. At this robbery, two males allegedly committed a "smash and grab" using tools such as hammers, gloves, and walkie-talkies provided by Defendant Watson. The individuals stole approximately $33,096 in jewelry and fled to Philadelphia in a car driven by Defendant and accompanied by Jerome Jeter. Defendant allegedly sold the jewelry to a Philadelphia jeweler and paid the three accompanying males for their participation.

The second robbery (Count Three) took place on or about August 15, 2003 at NMG Gold Exchange in Philadelphia. At this robbery, Defendant, Jerome Jeter and an unidentified male allegedly entered the store and jumped over the counter to steal approximately $5,000 in jewelry. Defendant once again drove the getaway car, sold the jewelry to a Philadelphia jeweler and paid the two accompanying males.

The third robbery (Count Four) took place on or about December 23, 2004 at the Sally Beauty Supply Store in Philadelphia. For this robbery, Defendant allegedly orchestrated a plan for Jerome Jeter and two additional males to commit a "smash and grab" of a jewelry store. Once again, the Government alleges that Defendant provided the males with hammers, masks and gloves, and drove the males to the location. This time, however, Defendant allegedly provided a Colt .38 caliber revolver to Jeter in addition to the other robbery tools. Upon arrival at the target store, the males aborted the jewelry store robbery plan. Thereafter, Defendant allegedly directed the three males instead to rob the Sally Beauty Supply store next-door to the jewelry store. The individuals committed armed robbery of the beauty supply store and fled with approximately $136.

The fourth robbery (Count Six) also took place on or about December 23, 2004 at an A-Plus Sunoco Store in Philadelphia. For this robbery, Defendant directed the same three males who robbed the Sally Beauty Supply Store to commit a similar armed robbery of this store. The individuals used disguises and a firearm provided by Defendant to steal money from cash registers. This time, the individuals fled in a getaway car while Defendant allegedly followed in a van. A high-speed chase between the individuals and police ensued, and Defendant attempted unsuccessfully to prevent the police from stopping the stolen getaway car by driving his van between the police cars and the getaway car.

The fifth robbery (Count Eight) took place on or about August 30, 2007, nearly three years after robberies three and four. Apparently, the Government intends to prove that Defendant unlawfully transported three men's Rolex watches worth approximately $24,325 from Chesapeake, Virginia to Philadelphia. The Government also intends to prove that it was Defendant's job to "transport[] the stolen jewelry back to Philadelphia to 'fence' or sell the stolen items to a Philadelphia jeweler." (Indictment, ¶12.)

The Court agrees with the Government that the variance in time, location, and actors of the robberies outlined by Defendant are not so great as to negate the similar character of the five robberies for Rule 8(a) purposes. The circumstances surrounding the five robberies are not exactly identical, but they need not be identical for joinder to be appropriate under Third Circuit case law. See, e.g., United States v. Bailey, 223 Fed. App'x 157, 161 (3d Cir. 2007) (finding no reversible error where the District Court found proper joinder of two counts arising from two arrests approximately eighteen months apart). Rather, the Court's holding is consistent with recent District Court case law in this Circuit involving robberies and issues of joinder. See United States v.

Gordon, 2004 WL 1879988, *2 n.1 (E.D. Pa. Aug. 17, 2004) (explaining that the Government need

not "show that a series of robberies all employed clown masks, an unusually worded demand note,

or a particular weapon" to satisfy the requirements of Rule 8(a)); United States v. Oliver, 379

F.Supp. 2d 754, 763-64 (E.D. Pa. 2005) (finding that the trial court would have acted within its

discretion in denying a motion to sever and that Defendant suffered no prejudice because the trial

court instructed the jury to consider each robbery separately); United States v. McNeill, 2007 WL

2234516, *2 (W.D. Pa. Aug. 2, 2007) (finding joinder proper where, *inter alia*, Defendant allegedly

committed four robberies with the same co-actor and where the modus operandi of robberies was

identical).[6]

For these reasons, the Court holds that there is a sufficient nexus between the Eight Counts

of the Superseding Indictment, notwithstanding the temporal separation and the variation in the

alleged incidents. The five robberies described above are of a "similar character" and constitute a

"common scheme or plan" to properly invoke the presumption of judicial economy addressed by the

joinder provision under Rule 8(a).

---

[6]The Court's decision is also supported by case law outside of the Third Circuit.
See United States v. Alexander, 135 F.3d 470, 476 (7th Cir. 1998) ("Counts may be joined
pursuant to [the same or similar character] prong of the rule if the offenses 'are of like class,'
even if they are not temporally or evidentially related."); United States v. Coleman, 22 F.3d 126,
133 (7th Cir. 1994) ("Further, the similarity of character of different offenses does not
significantly depend on their separation in time...Simply put, if offenses are of like class,
although not connected temporally or evidentially, the requisites of proper joinder should be
satisfied so far as Rule 8(a) is concerned."); United States v. Muniz, 1 F.3d 1018, 1023 (10th Cir.
1993) (finding proper joinder even where the "offenses took place on different dates at different
locations, and different witnesses and evidence were presented on each count"); United States v.
Kirkpatrick, 22 F.3d 50, 2008 WL 869978, *6 (Dec. 1, 1998) (finding proper joinder although
the offenses were "not connected temporally or evidentially"); United States v. Werner, 620 F.2d
922, 926 (2nd Cir. 1980) (finding proper joinder where the offenses were committed over twenty-
five months apart).

B.     Discretionary Severance Under Rule 14(a)

Next, Defendant Watson argues that even if the Court finds joinder of Counts One through Eight proper under Rule 8(a), he is nevertheless entitled to severance of Count Eight pursuant to Rule 14(a).[7]  Rule 14(a), <u>supra</u>, "recognizes that there may, nonetheless, be instances where joinder is inappropriate."  <u>United States v. Brown</u>, 2002 WL 32739530, *4 (M.D. Pa. Dec. 17, 2002). However, severance under Rule 14(a) is to be granted "only if there is serious risk that a joint trial will compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence."  <u>McNeill</u>, <u>supra</u>, at *3 (quoting <u>United States v. Zafiro</u>, 506 U.S. 534, 538-39 (1993)).

A defendant bears a "heavy burden" to show that he would suffer "clear and substantial prejudice resulting in a manifestly unfair trial."  <u>United States v. Rogers</u>, 2009 WL 650284, *1 (E.D. Pa. Mar. 12, 2009) (internal quotation omitted); <u>see also</u> <u>United States v. Console</u>, 13 F.3d 641, 655 (3d Cir. 1993) (finding reversible error where defendant shows "clear and substantial prejudice resulting in a manifestly unfair trial"); <u>United States v. Segal</u>, 534 F.2d 578, 583 (3d Cir. 1976) (stating that defendant has the burden of demonstrating that the failure to grant a severance will result in "real not fanciful" prejudice); <u>Government of Virgin Islands v. Sanes</u>, 57 F.3d 338, 341-42 (3d Cir. 1995) (finding joinder improper where it will result in a "manifestly unfair trial, beyond a mere showing that [defendant] would have had a better chance of acquittal with separate trials"). "Mere allegations of prejudice are not enough; and it is not sufficient simply to establish that severance would improve the defendant's chance of acquittal.  Rather, he must demonstrate clear

---

[7]"Rule 14's remedy of relief from prejudicial joinder only comes into play after it has been determined that joinder was permissible under Rule 8 or Rule 13."  <u>United States v. Graci</u>, 504 F.2d 411, 413 (3d Cir. 1974).

and substantial prejudice resulting in a manifestly unfair trial." <u>United States v. Reicherter</u>, 647 F.2d 397, 400 (3d Cir. 1981) (internal citations omitted).

Under these precepts, the question of whether to sever offenses charged in an indictment rests in the discretion of the Court. <u>United States v. Lore</u>, 430 F.3d 190, 205 (3d Cir. 2005). As mentioned above, "the importance of judicial economy dictates a preference for joint trials." <u>Shaw</u>, 2009 WL 3790310, at *8. Consequently, a district court should exercise this discretion only if the defendant has shown a "serious risk that a joint trial would compromise a specific trial right of one of the defendants." <u>Zafiro</u>, 506 U.S. at 539.

Here, Defendant Watson argues that introduction of evidence of alleged crimes listed in Counts One through Seven of the Superceding Indictment would unduly prejudice the jury in deciding Count Eight, which charges a crime that Defendant submits is temporally and evidentially unrelated to the crimes charged in the other counts, as discussed <u>supra</u>. Defendant maintains that the Government will be unable to present evidence linking Defendant to the crimes alleged in Count Eight, i.e. evidence that Defendant stole the three men's Rolex watches, brought them to Pennsylvania from Virginia, or was in possession of the watches when they were seized. Rather, the Government plans to present evidence pertaining to Counts One through Seven which charge Defendant with conspiring to rob jewelry stores in New Jersey and Pennsylvania with three other persons. Consequently, Defendant argues that he will suffer prejudice if severance of Count Eight is not granted because the jury will cumulate evidence against him and infer a criminal disposition based on evidence relevant only on Counts One through Seven.

Defendant's argument is not convincing. Instead, the Court is persuaded that if severance is granted and a separate trial is held on Count Eight only, it is likely that evidence pertaining to the other robberies would be admissible under Federal Rule of Evidence 404(b) to show common plan, identity, opportunity, or distinctive modus operandi.[8] Specifically, the Government would seek to introduce evidence of Defendant's involvement in a conspiracy to rob jewelry stores as alleged in Counts One through Seven to prove that Defendant (and not Ms. McGeth) was the party responsible for taking and/or hiding the three men's Rolex watches in Ms. McGeth's house on August 30, 2007. Additionally, the Government would seek to introduce at a trial on Count Eight the sledgehammer and crowbar, which were the contents of the black duffel bag found in Ms. McGeth's home, discussed supra. These tools of the robbery trade would be admissible under Rule 404(b) to prove a distinctive modus operandi.

Consequently, in cases such as this one where "evidence of each of the joined offenses would be admissible in a separate trial for the other," concern about cumulation of evidence and inference of a criminal disposition are "largely absent." McNeil, 2007 WL 2234516, at *3 (quoting United States v. Dileo, 859 F.Supp. 940, 944 (W.D. Pa. 1994)); see, e.g., Hudgins, 338 Fed. App'x at 153 (affirming the denial of severance because evidence of a first robbery would have been admitted in a trial for the second robbery as proof of plan and knowledge under Fed. R. Evid. 404(b)); United States v. Torres, 251 Fed. App'x 763, 764 (3d Cir. 2007) (finding no prejudice and proper denial of severance where evidence of other robberies would have been admissible in separate trials to

_____

[8]Fed. R. Ev. 404(b) provides as follows: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

demonstrate Defendant's identity as one of the robbers). Here, bifurcation is an unnecessary remedy because evidence in a subsequent trial will likely be duplicative of that presented by the Government in the initial trial, and the prejudice to Defendant at the first trial will be "largely absent."

A jury can reasonably be expected to compartmentalize evidence to prove the various offenses. Reicherter, 647 F.2d at 400. A properly instructed jury will be able to compartmentalize evidence at trial of the four robberies committed between August 2003 and December 2004 from evidence of the alleged robbery of three men's Rolex watches in August 2007. As the Supreme Court explained, "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of relief to be granted, if any, to the district court's sound discretion." Zafiro, 506 U.S. at 538-39 ("less drastic measures, such as limiting instructions, often will suffice"). Of course, the Court will instruct the jury to consider each robbery separately. See Oliver, 379 F.Supp.2d at 764 n.35; Brown, 2002 WL 32739530, at *5 n.8; Bailey, 223 Fed. App'x at 161. Finally, Defendant "is represented by experienced counsel, and the risk of confusion is virtually non-existent." Dileo, 859 F.Supp. at 944.

## V.     CONCLUSION

The Government has proven that the search of Ms. McGeth's home and seizure of the black duffel bag and its contents on August 30, 2007 was reasonable based on the voluntary consent doctrine, and the evidence will not be suppressed. Further, Defendant Watson has not demonstrated that the risk of unfair prejudice overcomes the preference for a single trial in circumstances such as those presented here. Defendant has offered no reason to believe that a jury will not be able to compartmentalize the evidence as to each count of the Superceding Indictment, nor has Defendant offered a reason to expect the jury to either refuse or be unable to follow a limiting instruction from

the Court.  For the foregoing reasons, Defendant's Motion to Suppress Physical Evidence (Doc. No.

60) and Motion to Sever (Doc. No. 55) will be denied.  An appropriate Order follows.